*763 OPINION OF THE COURT
Diane A. Lebedeff, J.
These two nonpayment proceedings involve two adjoining apartments rented by a tenant for himself and his two children. The central issues involve the warranty of habitability, punitive damages, damages for emotional distress and attorney’s fees. In the finest traditions of the adversary system, every point was vigorously contested.
FACTS
The tenant rented Apartment No. 20G on October 1, 1978, and Apartment No. 20E, on January 1, 1979; these two apartments are located at 25 Central Park West, Manhattan. The monthly combined rental for both apartments is approximately $1,300.
The tenant credibly testified that almost from the inception of the tenancy for each apartment, there were leaking ceilings and defective plaster areas in the ceilings and around the windows. Photographs of current conditions were introduced and the building’s resident superintendent admitted that they revealed condensation and deterioration of plaster areas. In addition, the owner’s employees confirmed that plastering and repainting were done upon occasion.
The primary source of the leakage was viewed by all parties as leakage from the terrace located above the two apartments. Between that terrace and the apartments is a crawl space, which contained “pans” or troughs to catch water from evident leaks. These troughs were a temporary measure and a repair of the terrace itself had been recommended by the owner’s contractor in the summer of 1979. Such repairs were not undertaken until the summer of 1980.
The owner presented evidence regarding the tenant’s installation of ceiling hung lights, but these lights were concededly installed well after the leaks commenced. Following the discovery of these lights by the management, an inspection of the crawl space ensued and it was found that the pans had been moved.
The second problem related to the provision of hot water *764 in Apartment No. 20G, which the tenant testified was lacking except that, for unexplained reasons, hot water did reach the apartment during the months of June, July and August of 1979 and for those same months in 1980. The repeated remedy was to drain air from the hot water line. While testimony was given that the condition resulted from an “air block” in the water supply line, given that other apartments in the line were not affected — which would be the case if an “air block” were present — this explanation of this phenomenon was questioned by the respondent.
The owner offered building records into evidence to establish' that there were few complaints from the tenant. These records were not dispositive for the testimony of building employees corroborated complaints and repairs not recorded in these files.
WARRANTY OF HABITABILITY
The court finds, after reviewing the evidence, that the tenant is entitled to an abatement of rent based upon the conditions relating to leaks and damaged plaster and to the deprivation of hot water. As to the evidence regarding any contribution by the tenant to the plaster damage, the court notes that there had been a complaint regarding “leaks throughout” one apartment long before the tenant took occupancy and that the problem existed long before the lights were installed.
In relation to an abatement for the leaks and plaster damage, several cases have sustained a 10% abatement as appropriate. (See N Town Roosevelt Assoc, v Muller, NY LJ, Oct. 27,1980, p 6, col 4; New York Eldorado v Balsam, NYLJ, Dec. 13, 1976, p 12, col 3; Clarendon Mgt. Co. v Boelter, NYLJ, April 29, 1980, p 4, col 1.) It should also be noted that abatements of 30 and 50% have been granted, although the more extreme case does indicate that flooding was present. (See 350 Assoc. v Feldman, NYLJ, Dec. 18, 1978, p 13, col 6; Sargent Realty Corp. v Vizzini, 101 Misc 2d 763.) A complete abatement of rent was granted for ceiling leaks resulting from a damaged roof in Kiysborough Realty Corp. v Goldbetter (81 Misc 2d 1054), although elements of punitive damages were also considered as a part *765 of that abatement. On the facts here, the court holds that an abatement of 10 % for each apartment is appropriate.
As to the lack of hot water for one apartment, the court finds that an abatement of 20% for each month in which such problem existed is proper. Such an abatement is less than the 50 % granted for no water in H & R Bernstein v Barrett (101 Misc 2d 611) and less than the 50% frequently allowed when neither hot water nor heat is provided.
The owner claims that any abatement claim must be limited to the earliest date of the nonpayment of rent. The law is clear that it is reversible error to limit proof on a warranty of habitability issue to the months in which rent was not paid. (350 Assoc. v Feldman, supra; Stahl v AM & PM Prods., NYLJ, March 1, 1979, p 7, col 5; Tidespy Corp. v Third World Culture Center, NYLJ, March 23, 1979, p 6, col 1.)
The court, following the rationale of N Town Roosevelt Assoc. v Muller (supra), will grant the abatement from the commencement of the problem which, in that case as is true here, began with the tenancy. No reason has been suggested as a basis for limiting the period of retroactive abatement, for there has been neither a prior nonpayment proceeding in which the tenant would have had an opportunity to press these claims (Tidespy Corp. v Third World Culture Center, supra) nor the existence of a claim exceeding a six-year Statute of Limitations (Korn v Landey, NYLJ, Dec. 13, 1976, p 12, col 3).
PUNITIVE DAMAGES
There is clear support for the availability of punitive damages in summary proceedings. Indeed, while recognizing the availability of that claim in a warranty of habitability case, although denying relief on the facts, the Appellate Term, First Department, in Hurkin v Mazzola (NYLJ, June 2, 1978, p 6, col 1), noted: “It has long been recognized that, as a general rule, in actions for breach of contract, the damages to be awarded are compensatory only. * * * The Court of Appeals, however, has permitted the recovery of punitive damages in actions in which they have *766 been otherwise traditionally denied where the offending conduct, aimed at the public generally, evinces such a high degree of moral culpability as to imply a ‘criminal indifference to civil obligations’ The emphasis placed upon “civil obligations” rests upon the theory that punitive damages are “awarded, upon public consideration as a punishment * * * for the wrong * * * and for the protection of the public against similar acts, to deter the defendant from a repetition of the' wronguful act, and to serve as a warning to others.” (14 NY Jur [Rev], Damages, § 176, p 36.)
The public interest relevant to a warranty claim in a summary proceeding was stated in Davis v Williams (92 Misc 2d 1051, 1055) as follows: “It is the unambiguous policy of this State to prevent the deterioration of residental structures and maintain our housing stock against the ever increasing menace of decay, neglect and abandonment * * * The remedy of punitive damages gives clear promise of serving effectively the policy of enforcing housing standards when the conduct which undermines them is malicious, wanton or reckless.” Further, it may be noted that to deny punitive damages in an appropriate case merely serves to assure those owners who ignore conditions which violate the warranty of habitability that the worst consequence will be an abatement of rent which reduces the rent to be paid to a proper rental value.
In light of these considerations, and based upon the clear evidence that the delayed correction of the leaking terrace was a deliberate decision of the petitioner which was, in the words of the extremely qualified resident superintendent of the building, a “management decision”, the court awards punitive damages in the amount of $1,000 for each apartment involved here. However, in relation to the other conditions and to the actions alleged as a basis for punitive damages, the court finds that such damages are not justified on this record and, therefore, in accord with New York Infirmary v Axelrod (NYLJ, Jan. 29, 1979, p 7, col 2) and 88 Lex Co. v Prieser (NYLJ, Dec. 18, 1978, p 13, col 5), denies punitive damages.
MENTAL DISTRESS
A further counterclaim has been interposed which is the *767 substantial equivalent of a claim for the intentional infliction of mental distress, although not clearly denominated. Under the standards of New York law, conduct underlying that claim must be “ ‘extreme and outrageous’ * * * ‘go beyond all possible bounds of decency, and * * * be regarded as atrocious, and utterly intolerable in a civilized community’ ”. (Fischer v Maloney, 43 NY2d 553, 557, adopting the language of Restatement, Torts 2d, § 46, Comment d.) The conduct here, while reprehensible, does not reach that base standard.
EFFECT OF LEASE PROVISION PROHIBITING COUNTERCLAIMS
Based upon lease provisions agreeing that the tenant will not interpose a counterclaim in a nonpayment proceeding, a motion has been made to dismiss the counterclaims. Of course, as a matter of law, such a clause cannot serve as a bar to a claim based upon the warranty of habitability. (Real Property Law, § 235-b, subd [2].)
Consideration of the counterclaims for punitive damages and the intentional infliction of mental distress was allowed because the facts pleaded for the warranty claim also served as the foundation for these two counterclaims. The elements of proof involved are similar to those which must be taken into account in relation to the warranty of habitability as defined by the Court of Appeals in Park West Mgt. Corp. v Mitchell (47 NY2d 316, 329): “In ascertaining damages, the finder of fact must weigh the severity of the violation and duration of the conditions giving rise to the breach as well as the effectiveness of steps taken by the landlord”. Given that the warranty counterclaim was to be tried, all three counterclaims were “intertwined with the landlord’s petition and * * * equitably tied together,” in which instance a court has an “equitable power to disregard” such a provision barring counterclaims with the recognition that the power “should be sparingly used and only if warranted by the circumstances at issue.” (50 Ct. Co. v Wild, NY LJ, Feb. 21,1978, p 13, col 1.)
Special note was made that the trial on the warranty issue necessarily establishes whether the claim for inten *768 tional infliction of mental distress will fall because the conduct does not reach the requisite level of atrocious conduct. The court does not here rule upon the question of whether that claim might also be dismissed because the conduct falls within some other cognizable claim. (See Fischer v Maloney, 43 NY2d 553, 557-558, supra, and the extensive discussion of New York law in Alexander v Unification Church of Amer., 634 F2d 673.)
The court holds that where, as here, the facts upon which a warranty of habitability claim is based are also pleaded as the foundation for counterclaims for punitive damages and for the intentional infliction of mental distress, that a lease provision prohibiting counterclaims may be disregarded, that the punitive damages issue should be determined, and that the mental distress claim may be examined to at least the extent of finding whether it will survive a motion to dismiss.
As to other counterclaims raised in the pleadings, they were withdrawn, with the exception that a claim for property damage was severed long before the trial.
attorney’s fees
The tenant has requested attorney’s fees pursuant to section 234 of the Real Property Law, which has been characterized as providing “that if a lease affords recovery of attorney’s fees to the landlord, then a like covenant in favor of the tenant shall be implied”. (Cox v First Nat. Realty & Constr. Corp., 50 AD2d 535.) In this case, both leases provide for a recovery of such fees by the landlord in a proceeding of this nature. (Cf. Steinberg v Carreras, 74 Misc 2d 32, revd on other grounds 77 Misc 2d 774.) In this case, the tenant has been successful on two counterclaims and is entitled to an award of attorney’s fees even if there will be a partial judgment of rent due and owing the landlord. (Concord Vil. Mgt. Co. v Rubin, 101 Misc 2d 625.)
The withdrawal of the landlord’s request for attorney’s fees at trial will not defeat the tenant’s statutory right to such fees. If this right could be defeated in that manner, the right to recover such fees would be left to the option of the landlord and the legislative intent of the provision would *769 be frustrated. Finally, that approach would deny the tenant the bargain which was made and would “impose an unexpected liability that, if known, might have induced those burdened with [such a clause] to avoid it”. (Cox v First Nat. Realty & Constr. Corp., supra, p 535.)
To determine the amount of the award for attorney’s fees, a hearing will be necessary. Counsel are directed to establish a mutually convenient time and date and to advise the court of their proposal.
Immediately after such hearing, if the conditions relating to the leaks or hot water supply are not corrected and if a renewed request is made for a stay pursuant to section 755 of the Real Property Actions and Proceedings Law, the court may issue a stay pending the elimination of the condition or conditions, provided that the tenant deposits with the clerk of the court an amount to be determined by the court and continues to deposit monthly an amount established by any such order. (See 15 & 19 West 55th St. Realty Co. v Mazzola, NYLJ, Oct. 26,1977, p 11, col 2.)