OPINION OF THE COURT
Renee A. White, J.
The petitioner, Pleasant East Associates, commenced this nonpayment proceeding requesting rent in the amount of $503 per month for the months of January, February *878 and March, 1984. A trial of this proceeding was held on June 25 and June 29, 1984. During the course of the trial the petition was amended to reduce the amount demanded to $164 a month and to include the months of April, May and June, 1984 for a total of $984.
FINDINGS OF FACT
Pursuant to a lease dated November 7, 1983 the respondent Jesus Cabrera and Eileen Van Wettering are the tenants of apartment 5C at 234 East 119th Street, New York County. That lease commenced December 1, 1983 and the lease term ends November 30, 1984. Under the terms of the lease the tenant was required to pay a rent of $164 a month. The building is subject to a mortgage insured by the Federal Housing Administration and the rent for the respondent’s apartment is subsidized by the United States Department of Housing and Urban Development (HUD) under section 8 of the Housing Assistance Program (US Code, tit 42, § 1437f).
The maximum permissible rent for apartment 5C is $503. The HUD subsidy provides the difference between the amount the tenant has agreed to pay ($164) and the maximum permissible rent.
In January, 1984 the respondent tendered the rent payment of $164 and the petitioner refused to accept it. Ms. Amonata Woody, the registered managing agent, was instructed not to accept the rent. She had been told by Mr. Medina, a partner of Pleasant East Associates, to refuse the rent and was advised that Medina was distressed by the fact that Ms. Van Wettering was occupying the apartment with Mr. Cabrera.
On March 2, 1984 the respondent was served with a three-day rent demand for the months of January, February and March, 1984 at the rate of $503 a month. After receiving that notice Mr. Cabrera spoke to Ms. Woody and was told to get Ms. Van Wettering out of the apartment. Mr. Cabrera, a black man, was living with Ms. Van Wettering, a white woman, and her children, and they were not married to each other. Ms. Van Wettering spoke with Mr. Medina and he told her that she could not occupy the apartment because she was not married to Mr. Cabrera. In *879 addition, she was told that she should not be living with a black man.
On May 29, 1984 the premises were inspected by the Division of Code Enforcement pursuant to a request made on May 22, 1984. Six violations were reported. A “C” violation was recorded for repair of the tread; three “B” violations were reported for window glass in the east room, leaky bathroom faucets, and broken tile floor; two “A” violations were reported for the air vent and window sashes.
Additional evidence, both oral and photographic, established the existence of leaks in the hall closet; leaks and ceiling and floor damage in the living room; a leaky living room radiator; rain leaks and water damage to the ceiling and wall of the kitchen; a leak near an electrical wall socket in the bedroom; and a rodent, roach and vermin infestation throughout the apartment, although the super had been notified those conditions existed since the inception of this lease. An order of this court was entered on July 10, 1984 directing the petitioner to make the necessary repairs.
MOTION TO DISMISS THE PETITION
The respondent moved to dismiss the petition on two grounds. The first ground is that the premises known as 234 East 119th Street, Apartment 5C, are not registered with the Rent Stabilization Association and, thus, the petitioner is not in compliance with rent control and rent stabilization laws.
It is the conclusion of this court that a landlord of a Federally subsidized insured building is not required to register with the Rent Stabilization Association. In City of Boston v Harris (619 F2d 87), the City of Boston challenged the HUD regulations which preempted all local rent control law as it applied to Federally insured subsidized housing. The United States Court of Appeals concluded that the newly promulgated regulations, 24 CFR 403.1 et. seq. expressly preempts local rent control laws as applied to Federally subsidized insured projects. 24 CFR 403.21 states: “[T]he Department concludes that it is in the national interest to preempt, and it does hereby preempt, the *880 entire field of rent regulation by local rent control boards, (hereinafter referred to as board), or other authority, acting pursuant to state or local law as it affects projects covered by this subpart.” Such preemption is not limited to rent levels. (City of Boston v Harris, supra; 24 CFR 403.1 [b].) 24 CFR 403.1 (b) expressly states that “compliance with [local law] * * * shall not be required as a condition of, or prerequisite to, the remedy of eviction, and any law, ordinance, or regulation which purports to require such compliance is similarly without force and effect.”
Thus, it is evident that the registration requirements under the Rent Stabilization Law are preempted by virtue of 24 CFR 403.21 and 403.1 (b) which specifically eliminates the registration requirement as a prerequisite. The same issue was before the Civil Court in the case of Axelrod v Various Tenants of Delano Vil. (123 Misc 2d 922). In that case, the court found that Federal preemption was absolute, thus registration with the Rent Stabilization Association was unnecessary.
The respondent contends that preemption cannot be absolute in that the Rent Stabilization Law protects tenants in ways not provided for in the HUD provisions. That claim is unfounded. Provisions for maintenance of services, requirements for eviction, lease and renewal protections, and similar provisions exist in both the regulations, HUD Handbook chapter 4, and the Model Lease Agreement (HUD Handbook, Appendix 19A). The Model Lease Agreement may only be changed with HUD’s approval. (HUD Handbook, 4350.3, par 4-2.)
Furthermore, “an express preemption provision obviates the need to examine whether an actual conflict exists. HUD’s regulations do expressly preempt local rent control law. 24 CFR § 403.1 (1979).” (City of Boston v Harris, 619 F2d 87, 94, n 18, supra.) Accordingly, the petitioner was not required to plead and prove that the building was registered with the Rent Stabilization Association and thus in compliance with rent control or rent stabilization laws. The motion to dismiss the petition on that ground is denied.
As a second point, the respondent moves to dismiss on the ground that the petitioner failed to serve the Federally *881 mandated termination of tenancy notice prior to the commencement of the proceedings. HUD regulations, incorporated into the lease between the parties, provides that the landlord must give prior written notice of the proposed termination.
However, in a nonpayment action the landlord may not terminate the tenancy prior to the commencement of the action. Rather, the landlord must invoke the tenancy in order to prevail. (RPAPL 711, subd 2.) In BSR Housing Dev. Fund v Ford (109 Misc 2d 445), the landlord commenced a nonpayment proceeding against a tenant residing in a building subsidized by HUD under section 8 of the Housing Assistance Program. The court found the Federal notice requirements concerning “termination of the tenancy by the landlord” applicable only to holdover proceedings. In a holdover proceeding, the tenancy must be terminated prior to the commencement of the action and the prior termination must be pleaded. Since 24 CFR 450.3 (a) (1) permits the landlord to terminate the tenancy for “Material noncompliance with the rental agreement”, which includes nonpayment of rent, the landlord has the option of bringing a nonpayment action or a holdover proceeding. That court held, and this court agrees, that “the requirement that the * * * notice state the grounds for eviction clearly indicates that it was to apply to a holdover proceeding which might be predicated on one or more of a number of grounds of which the tenant might not otherwise be aware. No such requirement is necessary in a nonpayment proceeding where the failure to pay rent is the only basis for the proposed eviction and hence no * * * notice is required.” (H.E.J. Realty Co. v Clark, NYLJ, July 30, 1982, p 6, cols 1-2.)
The case of Central Brooklyn Urban Dev. Corp. v Copeland (122 Misc 2d 726), relied on by the respondent, is distinguishable. That court held that the HUD notice requirements are applicable to both nonpayment and holdover proceedings. However, the court found (p 728) that the landlord was actually bringing a holdover proceeding “in the guise of a nonpayment proceeding” on the theory that the nonpayment of rent constitutes material noncompliance with the rental agreement, a ground for terminating *882 the tenancy under 24 CFR 450.3 (a) (1). Thus, the court treated the action as a holdover although it was brought as a nonpayment proceeding.
Here, the landlord has chosen to affirm the tenancy by choosing to bring a nonpayment, rather than a holdover proceeding. A holdover is brought after the landlord ab initio terminates the tenancy. In a nonpayment proceeding the court ultimately determines if termination is required, not the landlord.
For all of the above-enumerated reasons, the landlord’s failure to send a termination notice pursuant to the Federal regulations does not deprive this court of jurisdiction. No such notice was required. The respondent’s motion to dismiss is denied.
BREACH OF THE WARRANTY OF HABITABILITY
The respondent raises an affirmative defense and counterclaim that the petitioner has breached the warranty of habitability. Subdivision 1 of section 235-b of the New York Real Property Law provides that the landlord is deemed to covenant and warrant that the leased premises are “fit for human habitation and for the uses reasonably intended by the parties”. This court finds that the broken window glass, the leaky bathroom faucets, the broken tile floors, the inoperable air vent, the leaks in the closet and living room and kitchen, the leaky radiator, and the rodent and roach infestation all necessitate a finding that the warranty of habitability has been breached.
The determination of the amount of rent abatement to be granted as a result of the breach is not susceptible to precise determination. (Park WestMgt. Corp. v Mitchell, 47 NY2d 316, cert den 444 US 992.) Taken into consideration is the severity and length of the conditions, and the steps taken by the landlord, if any, to abate those conditions. (Park West Mgt. Corp. v Mitchell, supra.)
The water leaks in the ceiling, hall closet, and kitchen caused the plaster to warp off portions of the wall and ceiling. In addition, a leak near an electrical outlet in the bedroom caused a potentially dangerous condition. The tenants’ normal use of the apartment has been interfered with as a result of the recurrent dampness, seepage and *883 wasting effect of a water logged apartment. The broken windows and air vent affected the tenants’ right to adequate and appropriate ventilation. The broken floor tiles and tread were a hazardous violation. The infestation of rodents and roaches adversely affects the health and safety of the adults and children who reside in the apartment. The landlord has failed to respond to any requests to repair these conditions. As a result an abatement of 35% of the rent from December through June, for a total of $401.80 is awarded. (Century Apts, v Yalkowsky, 106 Misc 2d 762; New York Eldorado v Balsam, NYLJ, Dec. 13, 1976, p 12, col 3 [App Term, 1st Dept]; Clarendon Mgt Co. v Boelter, NYLJ, April 29, 1980, p 4, col 1 [App Term, 1st Dept]; Broadwall Investing Corp. v Zelman, NYLJ, July 27,1978, p 13, col 1; Sommer v Hyman, NYLJ, Feb. 9,1983, p 12, col 1; Concord Vil. Mgt. Co. v Rubin, 101 Misc 2d 625.)
PUNITIVE DAMAGES
The respondent additionally counterclaims for punitive damages. Where the respondent tenant proves that the landlord’s failure to provide services was intentional and malicious, punitive damages may appropriately be awarded. (111 East 88th Partners v Simon, 106 Misc 2d 693; Century Apts v Yalkowsky, 106 Misc 2d 762; Davis v Williams, 92 Misc 2d 1051.)
The overwhelming credible and reliable evidence establishes that the landlord was distressed by Ms. Van Wettering’s residence in the premises. Although she is a legal tenant and a signatory to the lease, the landlord was distressed by the lack of a marital relationship between her and the named respondent, and by their racial differences. In order to attempt to have her vacate the premises, the landlord intentionally and maliciously failed to take action to correct the conditions referred to above.
“The purpose of punitive damages * * * is to punish conduct which is morally culpable or actuated by evil and reprehensible motives. Such an award serves to deter a wrongdoer and others of like inclination from repetitions of the same or similar actions” (Davis v Williams, 92 Misc 2d 1051, 1054, supra).
This case cries out for the imposition of punitive damages. Such a remedy should serve to deter the petitioner *884 from repeating such conduct and serve as a warning to others. (111 East 88th Partners v Simon, 106 Misc 2d 693, supra; Century Apts v Yalkowsky, 106 Misc 2d 762, supra.) In light of these considerations, and based on the clear evidence that the petitioner’s failure to service the apartment was done with the clear intent to cause one or both of the tenants to vacate the apartment, the court awards punitive damages in the amount of $1,000.
In sum, the court determines that the amount of rent due the petitioner for the months of January through June, 1984 at the amount of $164 a month is a total of $984. A rent abatement is awarded in the amount of 401.80, leaving a balance of rent due in the amount of $582.20. The award of punitive dollars ($1,000) leaves a balance of $417.80 due and owing the respondent.